# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

O

## CIVIL MINUTES - GENERAL

| Case No. | CV 15-9732-GW(FFMx) | | Date | August 17, 2016 |
|---|---|---|---|---|
| Title | *Everette Silas, et al. v. Home Box Office, Inc., et al.* | | | |

| Present: The Honorable | GEORGE H. WU, UNITED STATES DISTRICT JUDGE | |
|---|---|---|
| Javier Gonzalez | None Present | |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None Present | None Present |

**PROCEEDINGS:**    **IN CHAMBERS - RULING ON  DEFENDANTS' REQUEST FOR PUBLICATION OF ORDER ENTERED JULY 26, 2016 DISMISSING PLAINTIFFS' FIRST AMENDED COMPLAINT [37]**

Defendants' Request for Publication of the Ruling on their Motion to Dismiss (see Docket No. 37) is granted.  Attached hereto is the final ruling which has been amended to correct certain typographical errors.

:

Initials of Preparer    JG

*__Silas, et al. v. Home Box Office, Inc., et al.__*, Case No. CV-15-9732-GW (FFMx)
Final Ruling on Motion to Dismiss

## I. <u>Background</u>

Everette Silas ("Silas") and Sherri Littleton ("Littleton") (collectively, "Plaintiffs") sue Home Box Office, Inc. ("HBO"), Stephen Levinson ("Levinson"), Mark Wahlberg ("Wahlberg"), Dwayne Johnson ("Johnson"), 7 Bucks Entertainment, Inc. ("7 Bucks"), and Leverage Management, Inc. ("Leverage") (collectively, "Defendants") for one claim of copyright infringement under 17 U.S.C. § 101 *et seq*.  *See generally* First Am. Compl. ("FAC"), Docket No. 18.

### A.  *Off Season*

Plaintiffs are the owners of an original motion picture trailer (the "Trailer"), a shortened trailer (the "10 Minute Trailer"),[1] a screenplay (the "Screenplay"), and a treatment   (the "Treatment") (collectively, the "Materials" or "*Off Season*") all entitled *Off Season*.  *Id.* ¶ 13. The Materials are based on the same plot and characters, and have each been registered with the U.S. Copyright Office.  *See id.*; Decl. of Lee Brenner in Support of MTD ("Brenner Decl."), Docket No. 23.

*Off Season* tells the story of Nathaniel Brandon Hall ("NBH"), the owner of a nightclub called "The Off Season."  *See* Brenner Decl. Ex. 4 (the Treatment), Episode ("Ep.") 1.[2]  NBH is also a professional football player who believes that he is an elite quarterback, despite some fans believing he is "washed up."  *See* Brenner Decl. Ex. 3 (the Screenplay) at 6.  NBH has a strong sexual aversion to African-American women, as evidenced by his often repeated motto, "No Black ho's [sic]."  *See, e.g., id.* at 5.

The Off Season nightclub is filled with "payoffs, sex, violence, and drugs in excess."  *See* Treatment Ep. 1.  Viewers are introduced to The Off Season and its moral vices within the first five minutes of the Trailer, when NBH solicits two prostitutes in his nightclub and takes them

---

[1] Although the FAC does not specifically allege that *Ballers* infringes on the 10 Minute Trailer, the FAC includes screenshots of images found exclusively in the 10 Minute Trailer when discussing alleged similarities between the Materials and *Ballers*.  *See* FAC at 11:23-13:16.  The Court will therefore construe the FAC as alleging that the 10 Minute Trailer was infringed upon as well.

[2] For reasons discussed *infra* Section III.A, the Court has determined that it may consider the exhibits referenced in the Declaration of Lee Brenner when ruling on Defendants' Motion to Dismiss.

into a VIP room.  *See* Brenner Decl. Ex. 1 (the Trailer) at 1:25-4:48.  Inside the VIP room are many of *Off Season's* other primary characters: (1) Bingo, NBH's older brother and a former football coach who is extremely violent; (2) Preach, a professional football player and pretty boy with a cocaine addiction; and (3) Lil' Bit, NBH's bodyguard and the moral compass of the show who encourages other characters not to do drugs.  *See generally* Screenplay.

*Off Season* follows three main story lines.  Foremost is NBH's ownership of The Off Season, including NBH's willingness to do whatever it takes to keep his nightclub operating smoothly, even if it requires bribing a detective to turn a blind eye and allowing his bouncers to beat up a cop.  *See* Screenplay at 18, 21.  NBH designed The Off Season to cater to professional football's elite clientele who need anonymity so that they may engage in their vices out of the public eye.  *See* Trailer at 1:00-1:08.

A second story arc is the romantic interest between NBH and his ex-wife[3] turned business partner, Annamaria.[4]  *See generally* Treatment.  The romance between NBH and Annamaria is introduced with flashbacks of the two falling in love on beaches and in public parks.  *See* Trailer at 17:17-18:35.  Viewers learn that the two had a falling out when Annamaria cheated on NBH, after NBH abused steroids to the point that he could not perform in the bedroom.  *See* Screenplay at 24.  Further complicating this potential romantic interest is Courtney Devine ("Devine"), an ex-pornstar who is rumored to be NBH's girlfriend.  *See id.* at 1, 15.  Devine also acts as a madam, providing NBH with prostitutes who are guaranteed to be silent about the illegal activity that takes place at The Off Season.  *See id.* at 4-7; Treatment Ep. 1.

The final story arc involves NBH's eighteen year-old daughter, Franee.[5]  *See generally* Treatment.  NBH doesn't want Franee to live the life the that he lived and attempts to keep her

---

[3] There is internal disagreement among the Materials as to whether NBH and Annamaria are still married.  *Compare* Brenner Decl. Ex. 4,  Ep. 1 (stating that Annamaria is NBH's wife), *with id.* Ex. 3 at 14 (NBH stating, "I get tired of [Annamaria] acting like we still [sic] married"), *and id.* at 11 (describing Annamaria as NBH's "soon-to-be-ex, wife [sic]").  Because this internal disagreement affects the Court's later analysis, the Court will refer to this inconsistency and footnote throughout.

[4] There is internal disagreement among the Materials as to the spelling of Annamaria's name.  *Compare* Brenner Decl. Ex. 3 at 11 (spelling the name "Annamaria"), and *id.* Ex. 4, Ep. 1 (same), *with id.* Ep. 1 (spelling the name "AnnaMaria").  For the sake of clarity, the Court will refer to this character as "Annamaria."

[5] There is internal disagreement among the Materials about the name of NBH's daughter.  *Compare* Brenner Decl. Ex. 3 at 13 (calling NBH's daughter "Lil' Mommah"), *with id.* Ex. 4, Ep. 1 (calling NBH's daughter "Zoe"), *and id.* Ep. 3 (calling NBH's daughter "Franee").  For the sake of clarity, the Court will refer to this character as "Franee" or as NBH's daughter.

away from his nightclub. *See* Treatment Ep. 3. Despite his protests, Franee is actively involved in making sure that the club operates smoothly. *See* Screenplay 3 at 26. Franee also strikes up a friendship with Devine, which makes NBH uncomfortable. *See* Treatment Ep. 4

### B. *Access to the Materials*

Beginning in May 2007, Plaintiffs began sharing the Materials with colleagues in the television industry. *See* FAC ¶ 14. Plaintiffs shared the Materials with Steve Mayer, who in turn shared the Materials with Chris Albrecht, the CEO of HBO. *See id.* In May 2008, Plaintiffs shared the Materials with a group of producers − Richard Brustein ("Brustein"), Mark Ciardi ("Ciardi"), and Gordon Gray ("Gray") − and a production company, Mayhem Pictures, Inc. ("Mayhem"). *See id.* ¶¶ 15-17. Ciardi expressed interest in the Materials and shared them with Wahlberg and Johnson. *See id.* ¶¶ 18-19. Plaintiffs allege that Wahlberg gave a copy of the Materials to his manager, Levinson. *See id.* ¶ 20. Plaintiffs contend that the Materials were then given to 7 Bucks (an entity owned by Johnson) and Leverage (an entity owned by Levinson). *See id.* ¶¶ 9-10.

In or around December 2008, Wahlberg, Johnson, and Levinson confirmed their interest in producing *Off Season* with Plaintiffs. *See id.* ¶ 21. Mayhem drafted a "Producer Attachment Agreement," but Plaintiffs refused to sign because it came with a verbal condition requiring Plaintiffs to remove their names from the "Created By" credits. *See id.* ¶¶ 21-22. Negotiations for the production of *Off Season* ended soon after. *See id.* ¶ 22.

### C. **Ballers**

On June 21, 2015, the pilot episode of the series *Ballers* aired on HBO, with Johnson portraying the lead character. *See id.* ¶ 25. Levinson, Wahlberg, Johnson, 7 Bucks, and Leverage were credited as producers. *See id.*

*Ballers* tells the story of Spencer Strasmore ("Strasmore"), a retired NFL linebacker who currently works for Anderson Financial, a finance management company with a newly opened sports division. Strasmore is haunted by fears that he might have suffered permanent brain damage from his years playing professional football and has a recurring nightmare of his career-ending hit that took another player out of the game. Strasmore made many financial mistakes during his career as a football player and counsels young players not to do the same. *See generally* Brenner Decl. Ex. 5 (*Ballers*), Ep. 1.

Strasmore has two main clients who are integral to the *Ballers* storyline: Ricky Jerret

(Jerret") and Vernon Littlefield ("Littlefield").   Jerret is a flashy, loudmouthed wide receiver who was cut from the Green Bay Packers after he fought a patron at a nightclub.  *See generally id.*  After a short period of free agency, Jerret is signed by the Miami Dolphins and is forced to suffer humiliating hazing rituals at the hands of one of his new teammates.  *See, e.g.*, *id.* Ep. 4 at 18:28-19:00, 25:46-26:06 (implying that, as a prank, Jerret's teammates stole his Ferrari, drove it to an abandoned parking lot, took off the wheels, and placed the car on cinderblocks).   Jerret starts the show with a Latina[6] girlfriend, Anabella, but after Anabella learns that Jerret slept with a teammate's mother, she leaves him.  *See id.* Ep. 6 at 21:17-25:31.

Littlefield is a defensive end for the Dallas Cowboys who is still playing on his rookie contract.  *See generally id.* Ep. 1.  Much of Littlefield's story arc focuses on negotiating with the Cowboys' management to secure a more lucrative second contract that would make Littlefield one of the highest-paid defensive players in the league.  *See generally Ballers.*  Littlefield is plagued by his entourage's lavish spending habits, most notably his childhood friend, Reggie. *See id.* Ep. 1 at 6:15-7:08; *id.* Ep. 2 at 5:58-7:41.  Reggie is a constant thorn in Strasmore's side, primarily because Strasmore repeatedly counsels Littlefield to behave more intelligently with his money and cut off members of his posse, including Reggie.  *See generally id.* Ep. 3.

Strasmore's partner at Anderson Financial is Joe Krutel ("Krutel").  *See id.* Ep. 1 at 7:09-8:55.   Krutel is a geeky white financial advisor who serves as comic relief to Strasmore's more serious and aggressive character.  *See id.*  Although Strasmore has humorous moments and Krutel has serious moments, a large portion of *Ballers'* comedic effect comes from Krutel and his juxtaposition with Strasmore.  *See generally Ballers.*

Initially, the main storylines in *Ballers* consist of: (1) Jerret signing with a new team and his inability to bond with his new teammates; (2) Littlefield negotiating a new contract and struggling with the financial success that comes with being a young professional football player; and (3) Strasmore's and Krutel's career advancement within Anderson Financial.  *See generally id.*

### D.  Defendants' Motion to Dismiss

In their FAC, Plaintiffs allege that *Ballers* borrows heavily from the Materials.  *See* FAC ¶ 26.  Specifically, Plaintiffs allege that *Ballers* contains "aesthetic elements, including, without

---

[6] Plaintiffs claim that Anabella is Colombian, but the Court found no reference to her nationality in *Ballers*.

limitation, physical appearance[s] of the characters and their vehicles, [ ] plots, scenes, as well as story lines [that] are virtually identical to the Materials."  *Id.*

On April 15, 2016, Defendants filed a Motion to Dismiss Plaintiffs' FAC.  *See generally* Mot. to Dismiss ("MTD"), Docket No. 21.  Along with the Motion, Defendants also filed a Request for Judicial Notice.  *See generally* Req. for Judicial Notice ("RJN"), Docket No. 24. Plaintiffs filed their Opposition Brief on May 13, 2016, *see generally* Opp'n Br. ("Opp'n"), Docket No. 28, and Defendants filed their Reply Brief on June 3, 2016, *see generally* Reply Br. ("Reply"), Docket No. 29.

In their Motion, Defendants do not dispute that they had access to the Materials, nor whether *Ballers* and the Materials are intrinsically similar to some extent.  Rather, Defendants argue that the Materials[7] and *Ballers* are not extrinsically similar.  Without extrinsic similarity, a copyright claim cannot survive.  *See, e.g.*, *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir. 1994) ("[A] plaintiff who cannot satisfy the extrinsic [similarity] test necessarily loses.").

## II. <u>Legal Standard</u>

A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in the complaint. Dismissal is proper only if the complaint lacks "a cognizable legal theory," or lacks "sufficient facts alleged under a cognizable legal theory."  *See Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir. 1988).  The court must accept all factual allegations pleaded in the complaint as true, and construe them and draw all reasonable inferences from them in favor of the nonmoving party.  *Cahill v. Liberty Mut. Ins. Co.,* 80 F.3d 336, 337-38 (9th Cir. 1996); *Mier v. Owens,* 57 F.3d 747, 750 (9th Cir. 1995).

The court need not, however, accept as true unreasonable inferences or legal conclusions cast in the form of factual allegations.  *See Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause

---

[7] Although the Materials constitute four separate copyrights, they are largely overlapping in content.  *See generally* Brenner Decl. Exs. 1-4.  As such the Court will refer to the Materials as a whole when discussing whether they are substantially similar to *Ballers*.  *See infra* Section IV. C-D.  Although the Court discusses the Materials as a whole, its determination that the Treatment, Screenplay, Trailer, and 10 Minute Trailer are each not substantially similar to *Ballers* was made by evaluating each individual copyrighted work.

of action will not do."). Thus, a plaintiff's complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citing *Twombly,* 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678; see also *Twombly,* 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)" (citations omitted)); *Moss v. U.S. Secret Serv.,* 572 F.3d 962, 969 (9th Cir. 2009) ("[F]or a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief.").

Although courts are generally not allowed to consider materials outside of the complaint when ruling on a 12(b)(6) motion, there are two exceptions to the rule. *See Lee v. City of L.A.*, 250 F.3d 668, 688 (9th Cir. 2001). First, the court may consider documents "whose contents are alleged in a complaint and whose authenticity no party questions." *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (citing *In re Silicon Graphics Inc. Sec. Litig.,* 183 F.3d 970, 986 (9th Cir. 1999)). Second, the court may take judicial notice of facts outside of the pleadings, subject to Federal Rule of Evidence 201, and consider those facts when ruling on a motion to dismiss. *See Mir v. Little Co. of Mary Hosp.*, 844 F.2d 646, 649 (9th Cir. 1988).

## III.  Defendants' Request for Judicial Notice and Consideration of Materials Outside the Complaint

Defendants request that the Court, in ruling on the Motion, consider the copyrighted Materials and the *Ballers* television series, and has provided these materials for the Court's review. *See generally* Brenner Decl. Exs. 1-9, Docket No. 23 to 23-9. Plaintiffs oppose this request and instead ask the Court to compare the copyrighted Materials and the *Ballers* script, rather than the *Ballers* television series. *See* Opp'n at 3:7-27. Defendants additionally request that the Court take judicial notice of: (1) eight elements common to prior works, *see* RJN at 1:2-23; (2) a large swath of the prior works themselves, *id.* at 4:18-12:2; and (3) that the name "Ann" and its variants are common in entertainment works, *id.* at 12:3-19.

### A.  Consideration of the Materials and Ballers

When specific documents are referenced in a complaint, but not attached to the

6

complaint, a defendant may introduce those documents without converting a 12(b)(6) motion into a summary judgment motion. *See Knievel*, 393 F.3d at 1076. Here, Defendants request that the Court consider the Materials and the *Ballers* series, *see generally* Brenner Decl., both of which are referenced in the FAC, but not attached, *see, e.g.*, FAC ¶¶ 13, 25-26.

Plaintiffs argue that when determining whether *Ballers* is substantially similar to the Materials, the Court must consider the *Ballers* script and disregard the *Ballers* television series. *See* Opp'n at 3:10-18. This argument is misguided for multiple reasons. First, courts regularly compare audiovisual and non-audiovisual works to determine whether works are substantially similar. *See, e.g.*, *Schkeiban v. Cameron*, No. CV 12-0636-R (MANx), 2012 WL 5636281, at *1 (C.D. Cal. Oct. 4, 2012) (comparing a non-audiovisual script with an audiovisual movie to determine substantial similarity on a motion to dismiss), *aff'd*, 566 F.App'x 616 (9th Cir. 2014); *Zella v. E.W. Scripps Co.*, 529 F.Supp.2d 1124, 1126-28 (C.D. Cal. 2007) (comparing a treatment and script, both non-audiovisual, with audiovisual television episodes to determine substantial similarity on a motion to dismiss). Second, in their FAC, Plaintiffs allege that the *Ballers* television series, not the *Ballers* script, infringes on their copyrights. *See, e.g.*, FAC ¶¶ 5, 25-26. Finally, because published works cause injury under copyright law, courts consider the final version of a film, rather than unpublished scripts, when determining substantial similarity. *See Meta-Film Assocs., Inc. v. MCA, Inc.*, 586 F.Supp. 1346, 1360 (C.D. Cal. 1984) (citing *Miller v. Universal City Studios, Inc.*, 650 F.2d 1365, 1375 (5th Cir. 1981) ("[T]he 'ultimate test of infringement [is] the film as broadcast rather than the underlying scripts.") (alteration added)); 4-13 *Nimmer on Copyright* § 13.03[B][1][*b*] (stating that "courts [ ] routinely rejec[t] requests to consider earlier drafts of the screenplay" when determining whether the works are substantially similar).

Defendants provided copies of the Materials and the *Ballers* television series with their Motion to Dismiss. *See* Brenner Decl. Exs. 1-5. The content of these materials is alleged in the FAC, *see generally* FAC, and Plaintiffs do not dispute the authenticity of these materials, *see generally* Opp'n. As such, the Court would consider the Materials and the *Ballers* television series when ruling on this Motion, and may consider their content as documentary facts alleged in the FAC. *See Zella*, 529 F.Supp.2d at 1126-28 (where plaintiff alleged that defendants' television show infringed its copyrighted treatment and script for a television show, court could consider copies of television show provided by defendants and could "consider the content of the

show as a [sic] documentary facts whose contents are alleged in the complaint").

### B. Defendants' RJN for Elements Common to Prior Works

Defendants additionally ask the Court to take judicial notice of eight elements which are common to prior works. *See* RJN at 1:16-23. Specifically, Defendants ask the Court to take judicial notice that prior works about the off-field lifestyles of professional football players frequently contain:

> (a) images of football stadiums, stadium lights[,] and football helmets; (b) cocky football players driving flashy sports cars; (c) football players wearing flashy chains or neck "bling"; (d) hip-hop music; (e) infidelity and players cavorting with numerous beautiful women; (f) players getting into fights; (g) hard partying and drug use (including at clubs and bars); and (h) reporters interviewing athletes.

*See id.*

As stated previously, a court typically may not consider material outside the pleadings when ruling on a motion to dismiss. *See Lee*, 250 F.3d at 688. The two exceptions to this rule are: (1) when material is attached to the complaint or necessarily relied on by the complaint, and (2) when the court takes judicial notice of matters of public record, provided the facts are not subject to reasonable dispute. *Id.* at 688-89 (further indicating that on a motion to dismiss, a court may properly look beyond the complaint to matters of public record and that doing so does not convert a Rule 12(b)(6) motion to one for summary judgment).

In the context of copyright cases, courts in the Central District have previously taken judicial notice of elements that are common to a given genre. *See Zella*, 529 F.Supp.2d at 1129 (taking judicial notice that a host, guest celebrities, interview, and cooking are generic elements of television cooking shows because they "can be verified simply by watching television for any length of time"); *DuckHole Inc. v. NBC Universal Media LLC*, No. CV 12-10077-BRO (CWx), 2013 WL 5797279, at *4 (C.D. Cal. Sept. 6, 2013) (quoting *Zella*, 529 F.Supp.2d at 1124) (taking judicial notice that veterinary-themed sitcoms have generic elements including: (1) settings of an operating room, examination room, and lobby; (2) pets; (3) a comedic tone and; and (4) romantic relationships, because they "can be verified simply by watching television for any length of time"). However, courts have refused to take judicial notice of elements that are not "generally known." *See Dillon v. NBC Universal Media LLC*, No. CV 12-09728 SJO (AJWx), 2013 WL 3581938, at *5 n.3 (C.D. Cal. June 18, 2013) (denying request for judicial

notice of elements common to reality television shows because "it cannot be said that [celebrities competing for the benefit of charity and contestants being eliminated by vote, for example] are 'generally known'" nor are they "'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned'") (citing Fed. R. Evid. 201(b)); *Capcom Co. v. MKR Grp., Inc.*, No. C 08-0904 RS, 2008 WL 4661479, at *3-4 (N.D. Cal. Oct. 20, 2008) (denying request for judicial notice of elements common to zombie-related movies and videogames because they are not generally known).

Here, the common elements which Defendants seek to have the Court judicially notice are similar to the elements in *Dillon* and *Capcom* because they are not "verified simply by watching television for any length of time" in the same way that cooking on a cooking show is readily verified. *See Zella*, 529 F.Supp.2d at 1129. For example, football players wearing flashy chains and being involved in fights are not "generally known within the [ ] court's territorial jurisdiction," nor would it be possible to "accurately and readily determin[e]" the existence of these elements by using "sources whose accuracy cannot reasonably be questioned." *See* Fed. R. Evid. 201(b).

The Court would therefore DENY Defendants' Request for Judicial Notice with respect to elements common to prior works.

### C. The Prior Entertainment Works

Defendants additionally ask the Court to take judicial notice of the movies, television shows, novels, and news articles that contain the aforementioned elements. *See* RJN at 4:18-12-2. Defendants cite no prior cases where a court has taken judicial notice of other works within a genre.[8]

Because the works indicated by Defendants in their RJN are not generally known, the Court would DENY Defendants' Request for Judicial Notice of the prior entertainment works.

### D. The Name "Ann" and Its Variants

Defendants' final request is that the Court take judicial notice that "[t]he name 'Ann' or variants thereof is common to entertainment works." *See* RJN at 12:6.

---

[8] In fact, in every case cited by Defendants where the court took judicial notice of a common element in a given genre, the court did not take judicial notice of other works within that genre. *See Zella*, 529 F.Supp.2d at 1129 (taking judicial notice of elements common to a genre but not the works which contained those elements); *Pelt v. CBS, Inc.*, No. CV-92-6532 LGB(SHX), 1993 WL 659605, at *3 n.3 (C.D. Cal. Oct. 25, 1993) (same); *Walker v. Time Life Films, Inc.*, 615 F.Supp. 430, 438 (S.D.N.Y.1985), *aff'd*, 784 F.2d 44 (2d Cir. 1986) (same); *DuckHole Inc.*, 2013 WL 5797279, at *4 (same).

Because this fact is not generally known within the Court's jurisdiction, nor would determination be possible by relying on sources whose accuracy cannot be questioned, the Court would DENY this request as well.

IV. <u>Analysis</u>

     *A. General Standards for Copyright Infringement*

To demonstrate copyright infringement, a plaintiff must show "(1) ownership of a valid copyright, and (2) copying of constituent elements of that work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Servs. Co.,* 499 U.S. 340, 361 (1991). Copying may be established by demonstrating (1) "that the [defendant] had access to plaintiff's copyrighted work," and (2) "that the works at issue are substantially similar in their protected elements." *Cavalier v. Random House, Inc.,* 297 F.3d 815, 822 (9th Cir. 2002).

Under Ninth Circuit law, courts employ a two-part test to determine if works are substantially similar: an intrinsic test and an extrinsic test. *Id.* "The intrinsic test is a subjective comparison that focuses on 'whether the ordinary, reasonable audience' would find the works substantially similar in the 'total concept and feel of the works.'" *Id.* (citing *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir. 1994)). Because the intrinsic test is a "subjective assessment of the concept and feel of two works," *Shaw v. Lindheim*, 919 F.2d 1353, 1360 (9th Cir. 1990), a determination of two works' intrinsic similarities "must be left to the jury," *Smith v. Jackson*, 84 F.3d 1213, 1218 (9th Cir. 1996).

A court may dismiss a complaint on a 12(b)(6) motion, however, for failing to satisfy the extrinsic test. *See Schkeiban*, 2012 WL 5636281, at *1 (dismissing a complaint with prejudice because the plaintiff could not satisfy the extrinsic test). The extrinsic test is an objective comparison of specific expressive elements which seeks to find "articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events in two works." *Cavalier*, 297 F.3d at 822 (citing *Kouf*, 16 F.3d at 1045).

In applying the extrinsic test, courts compare "not the basic plot ideas for stories, but the actual concrete elements that make up the total sequence of events and the relationships between the major characters." *Funky Films, Inc. v. Time Warner Entm't Co., L.P.*, 462 F.3d 1072, 1077 (9th Cir. 2006) (citing *Berkic v. Crichton*, 761 F.2d 1289, 1293 (9th Cir. 1985)). Courts must "filter out and disregard [ ] non-protectible elements" of a plaintiff's work and inquire only into "whether the *protectible elements, standing alone*, are substantially similar." *Cavalier*, 297 F.3d

at 822 (quotations omitted) (emphasis in original).

Because copyright law "protects expression of ideas, not the ideas themselves," stock scenes and themes "are not protected against copying." *See id.* at 823 (citing *Berkic*, 761 F.2d at 1293-94). Additionally, "[s]cenes-a-faire, or situations and incidents that flow necessarily or naturally from a basic plot premise, cannot sustain a finding of infringement." *Id.*

"[A] plaintiff who cannot satisfy the extrinsic test necessarily loses . . . because a jury may not find substantial similarity without evidence on both the extrinsic and intrinsic tests." *Kouf*, 16 F.3d at 1045 (dismissing a claim on summary judgment for failing to satisfy the extrinsic test); *see also Zella*, 529 F.Supp.2d at 1139 (dismissing a complaint on a motion to dismiss for failing to satisfy the extrinsic test).

### B. The Inverse Ratio Rule

In their Opposition to Defendants' Motion to Dismiss, Plaintiffs argue that the "inverse ratio rule" should apply to their case. *See* Opp'n at 2:28-3:2, 9:7-13. Under the inverse ratio rule, courts "require a lower standard of proof of substantial similarity when a high degree of access is shown." *Three Boys Music Corp. v. Bolton,* 212 F.3d 477, 485 (9th Cir. 2000).

In order for the inverse ratio to apply, a plaintiff must show that defendants had a "high degree of access" to the plaintiff's copyrighted works. *See Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1178 (9th Cir. 2003). This generally requires a plaintiff to show "access which is greater than or more compelling than that which is offered in the usual copyright case." *See Gable v. Nat'l Broad. Co.*, 727 F.Supp.2d 815, 823 (C.D. Cal. 2010) (quotations omitted), *aff'd*, 438 F.App'x 587 (9th Cir. 2011); *see also Metcalf v. Bochco*, 294 F.3d 1069, 1075 (9th Cir. 2002) (implying that reading a plaintiff's work triggers the inverse ratio rule).

Courts may, and frequently do, assume that plaintiffs have alleged access sufficient for the inverse ratio rule to apply when evaluating whether to dismiss a claim as a matter of law. *See, e.g.*, *Benay v. Warner Bros. Entm't*, 607 F.3d 620, 625 (9th Cir. 2010) (assuming access and the applicability of the inverse ratio rule on a grant of summary judgment); *Wild v. NBC Universal, Inc.*, 788 F.Supp.2d 1083, 1098 (C.D. Cal. 2011) (assuming access and the applicability of the inverse ratio rule on a motion to dismiss), *aff'd*, 513 F.App'x 640 (9th Cir. 2013).

Because Plaintiffs have alleged that Defendants had access to, and read or viewed, the Materials, the Court would apply the inverse ratio rule to Plaintiffs' claims. *See* FAC ¶¶ 9-10,

14, 19-20.  Thus, Plaintiffs' claim for infringement will only be dismissed if Plaintiffs cannot meet the lower standard of proof of substantial similarity.[9]  *See Benay*, 607 F.3d at 625.

### C. Whether Off Season *and* Ballers *are Substantially Similar*

Plaintiffs allege that the Materials and *Ballers* have substantial similarities in plot, setting, characters, theme, mood, dialogue, and pace.  *See* FAC at 10:1-18:7; Opp'n at 17:21-24 (alleging similarities in pace for the first time).[10]  The Court would find that the only actual alleged similarities between the two works relate to unprotected elements.  Additionally, the Court would find that the alleged similarities between protected elements of the works are not actual similarities that could result in a finding of substantial similarity under the extrinsic test.  As such, the Court would grant Defendants' Motion to Dismiss.

### 1.  Plot

Plaintiffs allege two similarities in plot between *Ballers* and the Materials.  *See* FAC at 10:14-18.  Plaintiffs also provide a chart of alleged similarities, some of which pertain to plot.  *See* FAC at 11:17-18:7.  In their Opposition, Plaintiffs direct the Court to an additional alleged similarity between the works that was not raised in the FAC.  *See* Opp'n at 13:23-27.

"Basic plot ideas . . . are not protected by copyright law."  *Cavalier*, 297 F.3d at 824.  When analyzing whether two plots are substantially similar, courts are required to look "beyond the vague, abstracted idea of a general plot" and instead focus on "the objective details of the works."  *Berkic*, 761 F.2d at 1293 (citing *Litchfield v. Spielberg*, 736 F.2d 1352, 1356 (9th Cir. 1984)).  Thus, the "test for 'substantial similarity of ideas' compares, not the basic plot ideas for stories, but the actual concrete elements that make up the total sequence of events and the relationships between the major characters."  *Id.*  In *Berkic*, the Ninth Circuit held that no reasonable jury could find that two screenplays were substantially similar because, although "at a very high level of generality" the works had similarities, including that "both deal[t] with criminal organizations that murder healthy young people, then remove and sell their vital organs

---

[9] Courts are unclear as to how much lower the threshold for proving substantial similarity becomes once a plaintiff has demonstrated a high level of access under the inverse ratio rule.  *See, e.g.*, *Benay*, 607 F.3d at 625.  Nonetheless, it is well established that when there is no similarity between the protectible elements of two works, there can be no finding of copyright infringement, even under the inverse ratio rule.  *See Shaw*, 919 F.2d at 1361.

[10] While it is generally improper to allege new legal theories in a reply brief, the Court will nonetheless consider Plaintiffs' arguments about substantial similarities in pace.  This is primarily because the Court would dismiss Plaintiffs' claim with prejudice, and a discussion of the two works' paces indicates that amendment of the FAC would be futile.

to wealthy people in need of organ transplants" and derived "their general story from the adventures of a young professional who courageously investigates, and finally exposes, the criminal organization," these ideas were only the basic plots of the two works. *Id.* The Ninth Circuit emphasized that the main characters and sequence of events had significant differences, the events were set in different settings, and there were different variances to the basic plot idea, including different romantic relationships between the characters. *Id.* Significantly, the court noted that although there were some similarities between the works, these similarities fell into categories of unprotectible expression and thus could not establish substantial similarity. *Id.* at 1293-94.

Here, although there are some generic similarities between *Ballers* and *Off Season*, there are no similarities between the actual objective details of the works. First, Plaintiffs allege that both works "follo[w] an African American football player who is essentially a business man who tries to monetize his friendships with other professional football players and athletes to help grow his business." *See* FAC at 10:14-16. However, even assuming that this allegation represents a protectible element and not a basic plot idea, it significantly misrepresents the works in multiple ways and is thus insufficient to state a claim for infringement. *See Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1295 (9th Cir. 1998) (emphasizing that courts "are not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint"). First, the main character in *Ballers*, Strasmore, is a retired football player, not an active football player like *Off Season's* main character, NBH. Second, the businesses that both characters are involved in are vastly different. Strasmore is an *employee* at a wealth management group, whereas NBH is an *owner* of a nightclub. Third, the way that each character "monetize[s] his friendships" is also significantly different. Strasmore monetizes his friendships by managing professional football players' wealth and ensuring that these players have enough money saved up for retirement. NBH monetizes his friendships by convincing other players to patronize his club and spend large amounts of money while in attendance.

Plaintiffs' second claim that the plots are substantially similar is that both Strasmore and NBH "serv[e] as a 'big brother/mentor' to other football players by looking out for them and taking care of personal affairs." *See* FAC at 10:17-18. This claim is also inaccurate for multiple reasons. First, the mentoring that Strasmore provides is financial. He repeatedly recounts stories of his own financial errors to clients hoping that his clients won't fall into the same traps that he

did.  NBH, on the other hand, is more of a friend than a mentor for the only other significant football player character in the series, Preach.  NBH and Preach are depicted in the VIP room doing drugs together, and Preach offers to provide NBH with cocaine.  *See* Trailer at 5:10; Screenplay at 16.  Additionally, the manner in which Strasmore and NBH look out for other football players is almost the exact opposite.  Strasmore counsels his protégés not to fall into the traps that pro athletes often fall into.  In contrast, NBH provides an outlet for professional athletes to fall into those traps in a location that the media cannot access.

Plaintiffs further allege that the works have similar subplots because both contain "a situation where [the lead character's] businesses and other players are blackmailed" and "both NBH and [Strasmore] pay off the blackmailer in exchange for silence."  *See* Opp'n at 13:23-27.  Once again, even if this was a concrete element and therefore protectible, the allegedly similar subplots contain significant differences.  In *Ballers*, one of Strasmore's clients, Littlefield, is blackmailed by a lawyer and Strasmore's ex-girlfriend with pictures of Littlefield doing drugs at a party.  In *Off Season*, NBH is blackmailed by a corrupt detective who promises not to investigate The Off Season if NBH pays her $50,000.

In their chart of similarities, Plaintiffs allege numerous other similarities in plot between the two works.  *See* FAC at 11:17-18:7.  The Court has examined each of the alleged plot similarities and finds that none of the alleged similarities are substantially similar in their protectible objective details.  The Court specifically addresses five of the many alleged similarities below.

> a.  *Row 4: Interview about "how [Jerret's and NBH's] off the field issues ha[ve] affected [ ] on the field play."*

Although interviews take place in both works, they are not substantially similar.  In *Ballers*, Jerret is interviewed at his mansion by a sports reporter who asks about how he is fitting in with his new teammates after being signed by the Dolphins during the off season.  This scene primarily emphasizes that Jerret is broken by his family history.  Jerret tells a compelling story about how he wears the number 18 because he wants to be the opposite of his father, a man who left him and his mother and wore the number 81 while playing professional football.  *See Ballers* Ep. 6 at 21:18-24:50.

In *Off Season*, NBH is interviewed at a studio by a reporter who asks him about his injury concerns and plans for the off season.  There is no mention of fitting in with teammates or

changing teams during the off season.   NBH's interview scenes in *Off Season* are used to introduce his personality traits: his arrogance, blunt responses to criticism, and aversion to black females.  *See* Screenplay at 6, 15.

> b. *Row 9: Both Jerret and NBH "pa[y] off a dirty cop to turn a blind eye"*

These scenes are also not substantially similar.   In *Ballers*, Jerret strikes a deal with a patrol officer (who appears to be his girlfriend's uncle) to set up a teammate who has been hazing him during training camp.   The patrol officer threatens to arrest Jerret's teammate, but Jerret comes in and "smooths things over" with his confederate, thus tricking his teammate to into thinking that he owes Jerret a favor.   Jerret uses the favor immediately to make the training camp hazing stop.    Jerret then offers the officer a pair of shoes, which he presumably signed. The officer initially refuses the gift but reluctantly accepts when Jerret says that they could buy "new uniforms for the [police] department softball team."  *See Ballers* Ep. 5 at 18:25-21:35.

*Off Season*'s bribery scene is nothing like the scene in *Ballers*.   In *Off Season*, a detective, not a patrol officer, demands payment from NBH so that her subordinates will look the other way when it comes to The Off Season's patrons violating the law.   The detective demands $50,000, but NBH only pays $10,000.   It is later revealed that the detective and Bingo are romantically involved.  *See* Screenplay at 22-23.

> c. *Row 10: A "prominent football player ["Rod" in* Ballers *and Preach in* Off Season*] dies"*

These scenes are not similar.   In *Ballers*, despite the tragic content of the scene, the death of Rod is told in a comedic manner.   The audience is introduced to Rod's character as he drives a Bentley through the streets of Miami moments before his death.   In the passenger seat is a woman who asks him questions in the vein of "do you love me?"; "how much do you love me?"; "what would you do to prove that you love me?"   After a few of these questions, the woman tricks Rod into saying "[I would do] absolutely anything [for you], baby," to which the woman responds, "Even leave your wife?"   Rod responds with silence.   Obviously unsatisfied with this lack of an answer, or a very loud answer, Rod's mistress starts punching him.   Rod loses control of his car and crashes into an oncoming big rig killing himself and his mistress.  *See Ballers* Ep. 1 at 2:18-3:35.

In *Off Season*, Preach's death has no comedic effect.   In the Treatment, Preach is introduced to the audience three episodes prior to his death and is depicted as having a cocaine

problem.  Preach is called a "cokehead" in a voiceover and  Bingo informs the audience that Preach's father died of a cocaine overdose.  *See* Screenplay at 8, 28.   In episode four, Preach is found unconscious from an overdose during a party at The Off Season and is rushed to an emergency room for treatment.  *See* Treatment Ep. 4.  He dies sometime later.  *See id.* Ep. 5.

> *d.  Row 11: "After [the] funeral[,] a few players go to" a club in* Ballers*, and NBH's house in* Off Season*, "to commemorate [the] death"*

These scenes are not similar.  In *Ballers*, the after-funeral scene is a wild party at a nightclub that is broken up when Strasmore takes Jerret home, after Jerret has sex with a woman in the club's bathroom and then fights a club patron.  The funeral and nightclub scenes occur in the same episode.  *See generally Ballers* Ep. 1.

In *Off Season*, the after-funeral scene is somber.  It occurs at NBH's house, not a nightclub, and the characters "discuss the meaning of life."  There are no references to drugs, alcohol, or partying of any sort.  The get-together is broken up by police officers who want to interrogate NBH about some of the activity at The Off Season.  *See* Treatment Ep. 5.  In the next episode, which takes place on the evening of Preach's funeral, NBH hosts a party at his nightclub.  *See* Treatment Ep. 6.  During the party, the audience is introduced to a new character, "Yam."  *See id.*  Yam is a professional football player who is one of NBH's high school friends.  *See id.*

> *e.  Row 20:  NBH and Strasmore both host "an extravagant party," where "the best in professional football show up ready for good times."*

These scenes are also not similar.  In *Ballers*, the extravagant party is a "corporate event" for Strasmore and Krutel to recruit football players as clients for Anderson Financial.  The party starts in the day and carries on into the night with the main focus of the party being drama between Strasmore and Reggie.  *See generally Ballers* Ep. 3.

In *Off Season*, the extravagant party is a birthday party for Bingo.  No one is trying to recruit anyone else as a client.  The climax of the episode is Preach's overdose.  *See* Treatment Ep. 4.

### 2.  Setting

Plaintiffs claim that the setting of the two works is substantially similar because "both works take place in Miami, Florida[,] . . . are set **entirely in the Off season**," and "share scenes

on beaches, in offices, on boats, and in VIP rooms/Fun Houses."  Reply at 14:12-26 (emphasis in original).

The mere fact that the two shows are set in the same city does not give rise to a finding of substantial similarity of copyrightable expression.  *See Alexander v. Murdoch*, No. 10 CIV. 5613 (PAC) (JCF), 2011 WL 2802923, at *7 (S.D.N.Y. July 14, 2011) ("[T]he choice of [a particular city] as a setting is not in itself copyrightable.").  Nor can the various locations in Miami that Plaintiffs describe, such as "beaches, [ ] offices, [ ] boats, and [ ] VIP rooms/Fun Houses," support a finding of substantial similarity, because they naturally flow from the basic plot premise.  *See Cavalier*, 297 F.3d at 824 ("[S]etting[s] [that] naturally and necessarily flo[w] from the basic plot premise . . . constitut[e] scenes-a-faire and cannot support a finding of substantial similarity"); *see also Benay*, 607 F.3d at 627-28 (finding that settings such as "the Imperial Palace, . . . the Imperial Army's training grounds, and battle[fields] [ ] in various places in Japan" were unprotected settings which flowed naturally from the premise of "an American war veteran who travels to Japan to help the Emperor fight a samurai rebellion").

Additionally, the actual settings in which the two works at issue take place are noticeably different.  *Ballers* takes place in a wide variety of settings ranging from financial offices, to practice fields, to fancy restaurants.  *See generally Ballers*.  Only one *Ballers* episode takes place primarily in a single setting.  *See id.* Ep. 3 (depicting a party at a house and on a yacht docked in the backyard for the majority of the episode).  No single location could reasonably be said to be the focal point of *Ballers*.  On the other hand, *Off Season* primarily takes place in The Off Season nightclub.  *See, e.g.,* Treatment Eps. 1-2, 4, 6.  Although there are settings outside of the nightclub, the focal point of the show is the nightclub.  Additionally, the majority of episodes as described in the Treatment take place primarily in a single location.  *See, e.g.*, *id.* Ep. 1 (episode, other than flashbacks, takes place entirely in The Off Season); *id.* Ep. 2 (episode takes place primarily in hospital room); *id.* Ep. 4 (episode takes place entirely in and around The Off Season); *id.* Ep. 6 (episode takes place entirely in The Off Season).

One actual similarity between the two works is that they are both set entirely during professional football's off season.  However, this is a general story idea that is not a copyrightable element and therefore cannot be considered when conducting the extrinsic analysis.  *See Berkic*, 761 F.2d at 1293 (stating that "certain forms of literary expression" such as "the general idea for a story," are "not protected against copying"); *see also Cavalier*, 297 F.3d

at 822 (requiring the compared elements in the extrinsic substantial similarity analysis to be protectible).

In sum, the FAC fails to allege similarities in setting that could support a finding of substantial similarity.

### 3. Characters

Plaintiffs allege that NBH's traits can be seen in three *Ballers* characters: Strasmore, Jerret, and Krutel.  *See* FAC at 10:25-11:11; Opp'n at 15:6-16:6.  Additionally, Plaintiffs allege that *Ballers*' Annabella is substantially similar to *Off Season*'s Annamaria.  *See* FAC at 14:9-28; Opp'n at 11:16-24, 16:7-19.

However, as noted previously, only protectible elements standing alone may be compared when determining substantial similarity.  *See Cavalier*, 297 F.3d at 822.  Importantly, the Ninth Circuit recently consolidated its precedent regarding which characters are copyrightable by creating a three-part test.  *See DC Comics v. Towle*, 802 F.3d 1012, 1021 (9th Cir. 2015), *cert. denied,* 136 S. Ct. 1390 (2016).  Under this test, a character must (1) have "physical as well as conceptual qualities," (2) be "sufficiently delineated," and (3) be "especially distinctive" in order to receive copyright protection.  *Id.* (finding the Batmobile to be a protected character); *see also Walt Disney Prods. v. Air Pirates*, 581 F.2d 751, 755 (9th Cir. 1978) (finding Mickey Mouse to be a protected character); *Metro–Goldwyn–Mayer, Inc. v. Am. Honda Motor Co.*, 900 F.Supp. 1287, 1295–96 (C.D. Cal. 1995) (finding James Bond to be a protected character).

When analyzing whether two protectible characters are substantially similar, courts require a very high degree of similarity between characters.  *See Shaw*, 919 F.2d at 1358.  For example, in *Shaw* the court found that two characters, both called the "Equalizer," who were well educated, wealthy, had expensive tastes, fought against injustice, and were unshakably confident no matter how difficult a situation they faced, did not necessarily pass the extrinsic test for substantial similarity.  *See id.* at 1357-58 (stating that, with regards to a character comparison, "reasonable minds might differ as to the substantial similarity between the protected *ideas* of the respective works") (emphasis in original).  Additionally, courts do not find characters to be substantially similar when two characters have noticeable differences.  *See Benay*, 607 F.3d at 626-27 (finding that differences between two characters' traits including marital status, job, dreams/nightmares, and ideology prevented a finding of substantial similarity).

NBH is a protectible character under the *DC Comics* test.  His visual depiction in the

Trailer and 10 Minute Trailer means he has "physical as well as conceptual qualities."  *See DC Comics*, 802 F.3d at 1021.  The fact that NBH has an often-repeated catchphrase and dresses nicely means that he displays "consistent, identifiable character traits" and is therefore sufficiently delineated.  *See id.*  And finally, the totality of NBH's traits (professional quarterback, nightclub owner, referred to by a unique nickname, etc.) means that NBH is more than "merely a stock character" and is therefore especially distinctive.  *See id.* at 1022.

The question thus becomes whether Strasmore, Jerret, and Krutel are substantially similar to NBH.

### a.  NBH and Strasmore

Plaintiffs allege a paragraph-long list of similarities between NBH and Strasmore.  *See* FAC at 11:1-6; Opp'n at 15:9-14.  An examination of these alleged similarities, however, reveals that the characters are actually largely different.  First, Plaintiffs allege that both characters are "professional football player[s]."  *See* FAC at 11:1-2.  This ignores the fact that NBH is an active player whereas Strasmore is retired.  Second, Plaintiffs allege that both players are businessmen.  *See id.* at 11:2.  This ignores the fact that NBH owns a nightclub whereas Strasmore is an employee of a financial management company.  Third, Plaintiffs allege that both characters "suffered serious injuries."  *See id.* at 11:4.  This ignores the fact that NBH suffered knee and elbow injuries, whereas Strasmore thought he suffered a head injury, but was found to be injury-free after a medical examination.

Moreover, Plaintiffs fail to mention key differences between the characters − NBH is a quarterback, while Strasmore formerly played defense.  NBH has an ex-wife[11] and ex-pornstar as girlfriend; Strasmore is dating a sports reporter.  NBH has a teenage daughter, while Strasmore is childless.  NBH appears to think he is invincible; Strasmore, on the other hand, is aware of his limitations and terrified that he may suffer from head injuries.

As such, the Court would find that the FAC fails to allege substantial similarity between the works based on similarities between NBH and Strasmore.

### b.  NBH and Jerret

Plaintiffs additionally allege that NBH and Jerret are substantially similar.  *See* FAC at 11:6-8, Opp'n at 15:15-16:2.  Close examination of the characters reveals that there is no

---

[11] NBH may also be currently married or in the process of separation.  *See supra* note 3.  Regardless of which one is accurate, both versions are different from Strasmore, who was never married.

substantial similarity in the protected elements.

Plaintiffs allege that both characters have a "significant other who is Columbian." *See* FAC at 11:6-7. This ignores the fact NBH has an ex-wife[12] named Annamaria, whereas Jerret has a girlfriend named Annabella, and the fact that Anabella appears to be a generic Latina woman, not Colombian.[13]

Additionally, Plaintiffs fail to highlight key differences between the two characters. NBH's relationship was destroyed because he had an ex-pornstar girlfriend and was addicted to steroids, which caused him to be unable to perform in the bedroom; Jerret's relationship imploded after he cheated with a teammate's mother and was forced to reveal so on television. NBH plays quarterback for Miami's professional football team; Jerret plays receiver for Miami's professional football team. NBH has a daughter; Jerret is childless. During NBH's interview about off-field issues affecting on-field performance, NBH responds in a cocky manner to demonstrate his high opinion of himself; during Jerret's interview about off-field issues, Jerret opens up about his family and personal life, exposing his vulnerabilities. NBH does not explain why he wears his chain; Jerret wears a chain with the number "18" on it to remind himself that he should be the opposite of his father (who played pro football wearing "81" on his jersey). NBH frequently discusses his aversion to African-American women; Jerret never discusses a similar aversion.

The actual similarities between the two characters are that they are both well-dressed football players who are sexually promiscuous, drive fancy cars, and have a cocky attitude. This is not a protectible expression. *See D.C. Comics*, 802 F.3d at 1021.

### c. NBH and Krutel

Finally, Plaintiffs allege that Krutel and NBH are substantially similar because both are "fun loving guy[s] that part[y] and d[o] drugs with the other football players." *See* FAC at 11:9-11. While this generic character trait is common between the two characters, the FAC fails to sufficiently allege any similarity in protectible elements; rather, there are vast differences between the two. NBH is a NFL quarterback who is "tall dark and handsome" and "knows he's the shit." *See* Treatment, Ep. 1; Screenplay at 1. Krutel is a balding white financial advisor. *See*

---

[12] NBH may also be currently married or in the process of separation. *See supra* note 3. Regardless of which one is accurate, they are all different from Jerret, who was never married.

[13] As explained in *supra* note 6, *Ballers* does not reference Anabella's nationality.

*generally Ballers* Ep. 1.

> ### d.  Annamaria and Anabella

As a preliminary issue, Plaintiffs may not be able to establish that Annamaria is a protectible character.  *See D.C. Comics*, 802 F.3d at 1021.  Although Annamaria is visually depicted, she might lack pertinent character traits that would allow the court to conclude that she is sufficiently delineated and especially distinctive.  *See D.C. Comics*, 802 F.3d at 1021-23; *see also Rice*, 330 F.3d at 1175 (determining that the "Mystery Magician" was not a protected character); *Olson v. Nat'l Broad. Co.*, 855 F.2d 1446, 1452 (9th Cir. 1988) (denying protection to "lightly sketched characters").  However, Annamaria's joint business venture with NBH, lost innocence, and actions to help raise NBH's daughter in the environment of a nightclub might be enough to satisfy the *DC Comics* test and qualify Annamaria as a protectible expression.  *DC Comics*, 802 F.3d at 1021.  But the Court need not decide this issue in order to determine that Annamaria's character, in comparison with the allegedly infringing Anabella, does not favor a finding of substantial similarity between the works.

Even if Annamaria is copyrightable, Anabella is not substantially similar to her.  Annamaria divorced NBH before *Off Season's* story began[14]; in contrast, Anabella was dating Jerret when *Ballers'* story began.  Annamaria is in a business partnership with NBH after the divorce; Anabella never had a business partnership with Jerret.  Annamaria helps raise NBH's teenage daughter; Anabella has no interactions with teenagers.  Annamaria helps NBH bribe a cop; Anabella tries to get Jerret to live on the straight and narrow.

The actual similarities between the two characters (they are both fashionably-dressed, Latin-American[15] women who are cheated on by their football-player lover) are not similarities in *protectible* elements.  *See Shame on You Prods., Inc. v. Banks*, 120 F.Supp.3d 1123, 1165 (C.D. Cal. 2015) (quoting Alexander, 2011 WL 2802899, at *10 ("'[A] stunningly beautiful, fiery, temperamental, Latina mother, with a thick accent, who's in love with her Caucasian [ex-husband/husband] and always makes him do the right thing, especially where her son is

---

[14] Regardless of whether NBH and Annamaria are married, divorced, or going through a separation, *see supra* note 3,  the relationship between the allegedly similar characters is different because Anabella is dating Jerret and then breaks up with him.  Anabella is neither married to Jerret, nor has she divorced him, nor are they in the process of divorce.  *See generally Ballers*.

[15] Although Plaintiff alleges that Anabella is Colombian, *see* FAC at 4:9-13; Opp'n at 16:7-9, the Court found no information about her nationality in *Ballers*.  In any event, even if Plaintiff could establish that both women were Colombian, that additional factor would not be enough to make them substantially similar.

concerned' . . . is a stock character and therefore not copyrightable) (second alteration in original)).  Here the similar elements between Annamaria and Anabella are even less distinctive than those for which the court denied copyright protection in *Alexander*.

As such, the Court would conclude that the FAC fails to allege sufficient similarity between Annamaria and Anabella, even if Annamaria's character is protectible.

### 4. Theme

A work's theme is its overarching message.  *See Kouf*, 16 F.3d at 1045 (describing one work's theme as a "celebrat[ion] [of] family values" and another work's theme as "the triumph of good over evil"); *Schkeiban*, 2012 WL 5636281, at *2 (describing a work's theme as a commentary on "racism, genocide, imperialism[,] and environmentalism").  Not all works have themes.  *See, e.g., Olson v. Nat'l Broad. Co.*, 855 F.2d 1446, 1451 (9th Cir. 1988) ("The two shows . . . lack identifiable themes.").  When two works both lack identifiable themes, courts do not find that their common lack of a theme favors a finding of substantial similarity.  *See id.*  Additionally, there is no protection for stock themes or themes that flow necessarily from a basic premise.  *See id.*; *Cavalier*, 297 F.3d at 823.

In their FAC, Plaintiffs allege that the themes of the two works are substantially similar. *See* FAC at 10:6-11 (describing the themes of both works as "center[ed] around the fast paced and lavish lives of professional football players in the off season").  However, the alleged theme of "fast paced and lavish lives of professional football players" is an underlying plot idea, not a theme.  Additionally, generic ideas such as the ones Plaintiffs allege to be substantially similar are not protectible expressions and are therefore not considered in the extrinsic analysis.  *See Shaw*, 919 F.2d at 1356.

The Court would find that the FAC fails to allege a theme in either of the works.  Neither work has an overarching message or underlying meaning.  Both works appear to be designed solely for entertainment and not to communicate some sort of moral lesson.  As such, the FAC fails to adequately allege substantial similarity in the works' themes.

### 5. Mood

Plaintiffs allege that the mood of the two shows is substantially similar because both shows are "a mixture of drama and comedy," both play "all contemporary hip-hop and pop music," and both are "fast paced club and party driven."  *See* FAC at 11:13-15.

"A general mood that flows 'naturally from unprotectible basic plot premises' is not

entitled to protection."  *Shame on You*, 120 F.Supp.3d at 1158 (quoting *Rice*, 330 F.3d at 1177); *see also Rice*, 330 F.3d at 1177 (concluding that the moods of secrecy and mystery in the magic genre are "generic [and] constitute *scenes a faire*" (italics in original)).  Here, the "fast paced . . . party driven" mood is not protectible because it flows from the basic plot premise of football players' lives in the off season.

Additionally, in asserting that the mood of the two works is similar, Plaintiffs ignore significant differences between the shows.  *Off Season* is a dark drama, set primarily at night, which is replete with examples of unredeemed moral corruption: police officers extorting business owners, death by drug overdose, and prostitution.  Football, and the money and power that come with it, is portrayed as the root of these vices.  Even on a generous reading and viewing of the Materials, there are no humorous moments.

On the other hand, *Ballers* is a comedic drama, set primarily during the daytime, which focuses on how players spend their time during the off season and the relationships they have with their agents, teammates, and friends.  Football is portrayed in a more nuanced view in allowing players to live out their wildest dreams, both good and bad.  Indeed, *Ballers* has numerous humorous moments throughout the series.  *See, e.g.*, *Ballers* Ep. 2 at 4:06-4:50 (Krutel grabs a celebratory shot out of Strasmore's hand when he learns that Strasmore's client has not officially signed with their company.  Krutel then drinks the shot by himself and shoos Strasmore out of his office).

Thus the Court would conclude that the FAC fails to allege that the mood of the two works is substantially similar.

6.  Dialogue

Plaintiffs allege that *Off Season* and *Ballers* contain substantially similar dialogue because they both reference the Kobe Bryant cheating scandal.  *See* FAC at 17:17-20.[16]  In order for a plaintiff to demonstrate substantial similarity of dialogue, it must show "extended similarity of dialogue."  *See Olson*, 855 F.2d at 1450.

Plaintiffs do not allege extended similarity of dialogue, rather, they allege only one

---

[16] In Plaintiff's chart of similarities they appear to allege that the scenes that are similar also contain similar dialogue.  *See* FAC at 11:23-18:8.  For reasons discussed *supra*, those scenes are not similar and likewise do not contain substantially similar dialogue.

similar reference to a highly publicized event.  *See* FAC at 17:17-20.[17]  Additionally, the context in which the two shows reference the scandal is entirely different.  In *Off Season*, Devine tells NBH that he remains safe from public scrutiny by having relations with her and her prostitutes, but if he has relations with other women, "[he could] end up caught up like Kobe."  *See* Screenplay at 5.  In *Ballers*, the scandal is mentioned when Jerret proposes to Anabella after she had discovered his infidelity.  Still furious at Jerret, Anabella throws the engagement ring into a nearby fountain to which Jerret responds, "Baby, that's a $400,000 ring!"  Anabella retorts, "Kobe spent four million, you delusional prick!"  *See Ballers* Ep. 8 at 22:10.

Additionally, Plaintiffs ignore a key difference in dialogue between the two shows.  *Off Season* is told with frequent voiceovers narrating the story; *Ballers* has no such voiceovers.  *Compare* Screenplay, *and* Trailer, *with Ballers*.

For the foregoing reasons, the Court would find that Plaintiffs have failed to allege substantial similarity in the dialogue of the works.

> 7. Pace

Plaintiffs also allege that the pace of the two works are similar because both works "tak[e] place over the entire football off-season, which is measured in weeks, if not months."  Opp'n at 17:21-24.[18]

The timeline of a work is an important factor in determining whether pace is substantially similar.  *See, e.g.*, *Kouf*, 16 F.3d at 1046 (finding pace to be dissimilar where one story was told in 24 hours, and the other was told over multiple days).  However, it is important to recognize that a pace that "flow[s] necessarily or naturally from a basic plot premise, cannot sustain a finding of infringement."  *See Cavalier*, 297 F.3d at 823

Here, the similar timeline of the two shows flows naturally from Plaintiff's unprotectible basic plot premise: a story about football players during the football off season.  Additionally, even if this pace was protectible, a finding of substantial similarity of pace is not justified based on the pace of the individual episodes.  The majority of episodes in *Off Season* take place over the course of a single night or day.  *See, e.g.*, Treatment Ep. 1 (taking place entirely on opening night); Treatment Ep. 4 (taking place entirely on the day of Bingo's birthday party); Treatment

---

[17] Plaintiffs' FAC incorrectly cites to *Ballers* episode 8 at 22:50 as the reference to the Kobe cheating scandal.  The correct citation is Brenner Decl. Ex. 5 Ep. 8 at 22:10.

[18] Plaintiffs do not allege that the pace is similar in their FAC, but make this allegation in their Opposition.  *See* Opp'n at 17:21-24; *see generally* FAC.

Ep. 3 (taking place entirely on the day of Preach's funeral).  On the other hand, the vast majority of episodes in *Ballers* take place over multi-day or even multi-week stretches.  *See, e.g. Ballers* Eps. 1-2.

A further difference in pace between the two works is that *Off Season* contains frequent flashbacks that explain relationships between characters and advance various storylines.  *See generally* Trailer; Screenplay.  On the other hand, the flashbacks in *Ballers* depict only Strasmore's recurring nightmare.  *See, e.g., Ballers* Ep. 1 at 1:18-2:07.  This recurring scene is used to explain the psyche of Strasmore rather than advance the plot.

The Court would therefore conclude that the FAC fails to allege that the pace of *Off Season* is substantially similar to that of *Ballers*.

### 8. Miscellaneous Alleged Similarities

Plaintiffs contend that two other aspects of the works are substantially similar: the title of *Ballers* and the opening credits.  *See* FAC at 11:23-13:9, 17:11-13.

#### a. The Title

Plaintiffs claim that the title of *Ballers* is derived from the title of Episode Four of their Treatment, which is titled "The Ballers Ball."  *See* FAC at 17:21-22; Brenner Decl. Ex. 4, Ep. 4. Titles are not protected by copyright law.  *See Shaw*, 919 F.2d at 1362 ("[A] title cannot be copyrighted.").  However, evidence of identical titles can be circumstantial evidence that a defendant copied the plaintiff's work.  *See id.*

Although *Ballers* has a similar title to the Treatment's fourth episode, Plaintiffs' argument is undermined for two reasons.  First, the titles are not identical.  *Compare Ballers* (whole series entitled *Ballers*), *with* Treatment Ep. 4 (episode entitled *The Ballers Ball*); *see also Shaw*, 919 F.2d at 1362 ("The fact that the two works have *identical titles* [ ] weighs in [plaintiff's] favor.") (emphasis added).  Second, Plaintiffs' comparison is between an episode title and a series title.  *See id.* ("The fact that the two *works* have identical titles [ ] weighs in [plaintiff's] favor.") (emphasis added).

Because the titles are not identical, the Court would conclude that the FAC fails to allege circumstantial evidence of infringement based on the titles of the works.

#### b. The Opening Credits

Plaintiffs also allege that the opening sequences of the two works are substantially similar because both show images of a stadium, football helmets, and stadium lights.  *See* FAC at 11:23-

13:9.  While both sequences do contain these images, close analysis of both opening credits reveals that the two are vastly dissimilar.  *Off Season's* opening credits are set to electronic-sounding musical riffs that have no lyrics; *Ballers'* opening credits are set to an upbeat hip-hop song with lyrics.  *Off Season's* opening credits are narrated by the show's main character; *Ballers'* opening credits have no narration.  *Off Season's* opening credits feature multiple still images; *Ballers'* opening credits have no still images.  *Off Season's* opening credits depict only football helmets, a locker room, and a stadium; *Ballers'* opening credits show videos of athletes training, toddlers playing football, fans meeting their idols, checks being signed, a marching band, dogs running on a treadmill, gaudy sneakers, and panoramic views of Miami.  *Off Season's* opening credits depict a generic stadium at night; *Ballers'* opening credits depict Sun Life Stadium during the day.  No one is wearing a football helmet in *Off Season's* opening credits; every football helmet in *Ballers* is on a player's head.  *Off Season's* opening credits last 18 seconds; *Baller's* opening credits last one minute and eleven seconds.  *Compare* Brenner Decl. Ex. 2 (10 Minute Trailer) at 0:00-0:18, *with, e.g., Ballers* Ep. 1 at 0:08-1:19.

As such, the Court would find that these two sequences are not substantially similar.

### 9.  Conclusion

Although Plaintiffs allege many purported similarities between the *Off Season* and *Ballers*, the actual similarities are between unprotectible elements; the protectible elements of the works are significantly different.  The Court would therefore conclude that Plaintiffs have failed to sufficiently allege substantial similarity between the works under the extrinsic test.  *See Schkeiban*, 2012 WL 5636281, at *2 (granting motion to dismiss because evaluation of copyrighted work and allegedly infringing work revealed that "even though the two works overlap, a closer inspection reveals very different stories, and [the p]laintiff's compilations of random similarities scattered throughout the works are insufficient *scenes a fair*.  The characters and dialogue are dissimilar as a matter of law.  For example, the similarities that the plaintiff highlights . . . are mere general themes or plot ideas . . . the dialogue comparisons are similar in random ways at best); *Zella*, 529 F.Supp.2d at 1139 (granting motion to dismiss because "no reasonable jury could conclude that [the allegedly infringing work] is substantially similar to any protectible elements of [the copyrighted work]").

### D.  Whether Plaintiffs' FAC Survives Under Metcalf

In their Opposition Brief, Plaintiffs contend that even if no protectible elements in the

Materials are substantially similar to *Ballers*, the Court may still find that their claim passes the extrinsic test under *Metcalf*. *See Metcalf*, 294 F.3d 1069; *see also* Opp'n at 20:23-23:7.   In *Metcalf*, the Ninth Circuit summarized the two works at issue as follows:

> The similarities between the relevant works are striking: Both the [plaintiff's] and [defendant's] works are set in overburdened county hospitals in inner-city Los Angeles with mostly black staffs. Both deal with issues of poverty, race relations and urban blight. The works' main characters are both young, good-looking, muscular black surgeons who grew up in the neighborhood where the hospital is located. Both surgeons struggle to choose between the financial benefits of private practice and the emotional rewards of working in the inner city. Both are romantically involved with young professional women when they arrive at the hospital, but develop strong attractions to hospital administrators. Both new relationships flourish and culminate in a kiss, but are later strained when the administrator observes a display of physical intimacy between the main character and his original love interest. Both administrators are in their thirties, were once married but are now single, without children and devoted to their careers and to the hospital. In both works, the hospital's bid for reaccreditation is vehemently opposed by a Hispanic politician.

*Metcalf*, 294 F.3d at 1073-74.   The *Metcalf* court concluded that "[t]he totality of the similarities . . . [went] beyond the necessities of the . . . theme and belie[d] any claim of literary accident." *See id.* at 1074.   More broadly, the court held that when two works contain "many generic similarities" arising from "common patterns," the extrinsic test is satisfied.   *See id.*

Here, the two works at issue are readily distinguishable from those in *Metcalf*.   First, for the reasons discussed *supra*, *Off Season* and *Ballers* contain significant differences throughout the works.   And second, there is no common pattern from which the works' generic similarities arise.   *See, e.g.*, FAC at 15:20-23 (comparing the death of a football player who dies of a cocaine overdose in episode four of *Off Season* to the death of a football player who dies in a car crash in episode one of *Ballers*).   As such, the Court would find that the extrinsic test is not satisfied based on similarities in generic elements.   *See Zella*, 529 F.Supp.2d at 1138-39 (holding that extrinsic test was not satisfied under *Metcalf* where the "plaintiffs' claimed similarities between [the television shows] consist[ed] of randomly selected similarities of generic elements . . . [the] plaintiffs cannot merely cobble them together to make a *Metcalf* argument").

### E. *Leave to Amend*

As a general rule, leave to amend a dismissed complaint should be freely granted.  *See* Fed. R. Civ. P. 15(a).  However, leave to amend may be denied if a defective pleading "could not possibly be cured by the allegation of other facts."  *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995).

In the context of copyright, when a plaintiff is unable to demonstrate that a defendant's work is substantially similar to its copyrighted work, the court may dismiss a plaintiff's case with prejudice.  *See, e.g.*, *Gilbert v. New Line Prods., Inc.*, No. CV 09-02231 RGK, 2009 WL 7422458, at *6 (C.D. Cal. Nov. 16, 2009) (dismissing plaintiff's claim with prejudice after determining there was no substantial similarity because "no additional facts would allow [plaintiff] to prevail in her case"), *amended on other grounds*, No. CV 09-02231 RGK (RZx), 2010 WL 891333 (C.D. Cal. Feb. 17, 2010), *aff'd*, 490 F.App'x 34 (9th Cir. 2012); *see also Schkeiban*, 2012 WL 5636281, at *1 (dismissing complaint with prejudice because a lack of substantial similarity between works "is a defect that cannot cured by an amended complaint").

Here, because Plaintiffs cannot satisfy the extrinsic test and this defect cannot be cured by amendment, the Court would dismiss Plaintiffs' claim with prejudice.

## V. <u>Conclusion</u>

In sum, the Court would conclude that the Materials and *Ballers* are not extrinsically similar and no amendment could possibly cure that defect in Plaintiffs' case.  As such, the Court would GRANT Defendants' Motion and dismiss Plaintiffs' claim for copyright infringement with prejudice.